UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| UNITED STATES OF AMERICA EX REL. JAMES STEUERT, | : : : | Hon. Joseph H. Rodriguez |
| *Plaintiff/Relator* | : : | 11-cv-3385 |
| v. | : : : | |
| L3 HARRIS TECHNOLOGIES, F/K/A L-3 COMMUNICATIONS CORPORATION 1 FEDERAL STREET CAMDEN, NJ 08103 | : : : : : | Opinion |
| *Defendant.* | : | |

Relator James Steuert ("Relator") alleges that Defendant L3 Harris Technologies ("L3") violated the False Claims Act by billing the United States for work performed in connection with a contract with the Royal Australian Navy. L3 moved to dismiss Relator's Complaint and proposed Amended Complaint, arguing that Relator failed to allege that L3 knew of the unlawful billing. The Court will grant L3's motion to dismiss and deny Relator's motion for leave to file an amended complaint.

I.   **Factual and Procedural Background**

L3 "is a large defense contractor." [Am. Compl. ¶ 9]. Relator worked for L3 as "Lead Member Engineering Staff" from about August 2006 to about October 2010 in L3's "communication Systems East" division in Camden, New Jersey. [Am. Compl. ¶¶ 6, 12]. During his tenure, Relator "worked on contracts related to an underlying ship-based radio system called Symphony Automated Communications Manager" ("Symphony"). [Am. Compl. ¶ 15]. Symphony is a software system originally developed and specifically customized for the United

1

States Navy and Coast Guard that "automates communication systems and network functions for unmanned radio room operation on ships and boats." [Am. Compl. ¶¶ 15–16].

In January 2008, L3 entered a subcontract with the Royal Australian Navy ("RAN") "to supply communication systems" for use on certain RAN ships (the "RAN Contract"). [Am. Compl. ¶ 18]. As part of this contract, L3 agreed to "provide a modified version of its Symphony product to the RAN." [Am. Compl. ¶ 21]. Relator worked on the Symphony modifications for the RAN Contract. [Am. Compl. ¶ 23].

Relator alleges that in Summer 2009, Alexander Cubby ("Cubby"), a software manager at L3 "directed Relator and other software engineers to begin billing [RAN Contract] modifications not to the [RAN Contract] but to a new project designated Project X." [Am. Compl. ¶ 24]. He further alleges that L3 billed the United States government for the Project X costs as Independent Research and Development ("IR&D") funding. [Am. Compl. ¶ 25]. According to Relator, L3 billed the United States government for more than $10,000,000 in IR&D costs under Project X even though the "devices and customizations developed under Project X … were exclusively to be used for the Australian ships, specific to the Australian contract." [Am. Compl. ¶¶ 28–29]. The Court will explain the concept of IR&D in detail below as it is essential to the claims and defenses at issue in the present motions. For now, the crux of Relator's claim is that L3 charged the United States government for work performed in connection with the RAN Contract by billing that work to Project X rather than the RAN Contract.

To corroborate these allegations, the Amended Complaint alleges that, on July 6, 2010, Relator received a PowerPoint presentation titled Symphony Project X Software Requirement Review" (the "Presentation"). [Am. Compl. ¶ 37]. The Presentation lists modifications and new features for Symphony software that L3 engineers would have to complete as part of Project X.

2

[Am. Compl. ¶ 39]. The Presentation also indicates that the "RAN" was the "requesting customer" for several of these new features. [Am. Compl. ¶¶ 40–41].

For example, the Presentation indicates that the RAN requested an "audible alarm indication" feature. [Dkt. 26, Exh. A at 7]. According to the Presentation, "[t]his feature provides two new functions for the Symphony[:] – A GUI indication will be lit when Symphony receives an incoming call via ALE or SatCom. – Symphony will generate a tone in a headset or handset when an external alarm input is received." [*Id.*]. This feature would satisfy the "customer need" to "facilitate and guarantee notification of incoming calls and alarms in high noise [sic] environment."[1] [*Id.*].

Relator alleges that at least thirteen L3 employees billed RAN Contract work to Project X pursuant to the Cubby's instruction, including Cubby himself and five others identified by name in the Amended Complaint. [Am. Compl. ¶¶ 26–27]. Relator also alleges that this scheme to bill RAN Contract work to Project X "could not have been" implemented "without the specific approval" of Bob Redmond ("Redmond"), Vice President of Engineering at L3. [Am. Compl. ¶ 30]. According to Relator, Redmond "was required to consult with Defendant L3's compliance department before permitting [RAN Contract costs] to be reclassified as Project X work billed to United States." [Am. Compl. ¶ 36]. Relator claims that, during the relevant period, L3 "maintained a compliance department and a Code of Conduct which requires the accurate reporting and billing to government customers in a truthful, complete, and accurate way." [Am. Compl. ¶ 35].

---

[1] The Presentation provides a link to "additional material for Customer requirements" that is inaccessible to the Court.

Relator filed his initial *qui tam* complaint ("the Complaint") under seal with this Court in 2011. [Dkt. 1–2].[2] The Complaint alleged that L3 violated the False Claims Act, 31 U.S.C. § 3729 et seq. ("FCA"), by fraudulently billing the United States for work performed under the RAN Contract. The Court then entered an order staying and administratively terminating the case while the United States ("the Government") investigated Relator's allegations. [*See* Dkt. 2]. On April 21, 2021, the Government filed a notice under 31 U.S.C. § 3730(b)(4)(B) indicating that the Government decided not to intervene in Relator's case. [Dkt. 3]. That day, the Court ordered that the case be unsealed and reopened. [Dkt. 4].

L3 then filed the present motion to dismiss the Complaint. [Dkt. 9]. Relator opposed the motion and cross-moved for leave to file an amended complaint (the "Amended Complaint") that supplements the Complaint filed nearly ten years earlier. [Dkt. 14]. L3 then filed a reply, arguing that the proposed Amended Complaint is futile because it does not cure the defects in the Complaint.

## II. Standards of Review

### a. Rule 12(b)(6)

Federal Rule of Civil Procedure 12(b)(6) permits dismissal for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). A complaint should be dismissed pursuant to Rule 12(b)(6) if the alleged facts, taken as true, fail to state a claim. *Id.* In general, only the allegations in the complaint, matters of public record, orders, and exhibits attached to the complaint, are taken into consideration when deciding a motion to dismiss under Rule

---

[2] The FCA authorizes individual "relators" to file a *qui tam* action in the Government's name. *United States ex rel. Kreindler & Kreindler v. United Techs. Corp.*, 985 F.2d 1148, 1153 (2d Cir. 1993) (citing 31 U.S.C. § 3730(b)(1)). "[T]he government may either intervene and prosecute the action, § 3730(b)(2), or allow the original plaintiff—the qui tam relator—to proceed with the suit under § 3730(b)(4)(B)." *Id.*

12(b)(6). *See Chester Cnty Intermediate Unit v. Pa. Blue Shield*, 896 F.2d 808, 812 (3d Cir. 1990). It is not necessary for the plaintiff to plead evidence. *Bogosian v. Gulf Oil Corp.*, 561 F.2d 434, 446 (3d Cir. 1977). The question before the Court is not whether the plaintiff will ultimately prevail. *Watson v. Abington Twp.*, 478 F.3d 144, 150 (3d. Cir. 2007). Instead, the Court simply asks whether the plaintiff has articulated "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

"A claim has facial plausibility[3] when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556). "Where there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Iqbal*, 556 U.S. at 679.

The Court need not accept "unsupported conclusions and unwarranted inferences," *Baraka v. McGreevey*, 481 F.3d 187, 195 (3d Cir. 2007) (citation omitted), however, and "[l]egal conclusions made in the guise of factual allegations . . . are given no presumption of truthfulness." *Wyeth v. Ranbaxy Labs., Ltd.*, 448 F. Supp. 2d 607, 609 (D.N.J. 2006) (citing *Papasan v. Allain*, 478 U.S. 265, 286 (1986)); *see also Kanter v. Barella*, 489 F.3d 170, 177 (3d Cir. 2007) ("[A] court need not credit either 'bald assertions' or 'legal conclusions' in a complaint when deciding a motion to dismiss." (quoting *Evancho v. Fisher*, 423 F.3d 347, 351 (3d Cir. 2005))). *Accord Iqbal*, 556 U.S. at 678–80 (finding that pleadings that are no more than conclusions are not entitled to the assumption of truth).

---

[3] This plausibility standard requires more than a mere possibility that unlawful conduct has occurred. "When a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of 'entitlement to relief.'" *Id.*

Further, although "detailed factual allegations" are not necessary, "a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of a cause of action's elements will not do." *Twombly*, 550 U.S. at 555 (internal citations omitted). *See also Iqbal*, 556 U.S. at 678 ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.").

Thus, a motion to dismiss should be granted unless the plaintiff's factual allegations are "enough to raise a right to relief above the speculative level on the assumption that all of the complaint's allegations are true (even if doubtful in fact)." *Twombly*, 550 U.S. at 556 (internal citations omitted). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged-but it has not 'shown'—'that the pleader is entitled to relief.'" *Iqbal*, 556 U.S. at 679 (quoting Fed. R. Civ. P. 8(a)(2)).

      b. **Rule 9(b)**

FCA claims are subject to Federal Rule of Civil Procedure 9(b)'s heightened pleading standard because they sound in fraud. *See Foglia v. Renal Ventures Mgmt., LLC*, 754 F.3d 153, 155 (3d Cir. 2014). Rule 9(b) requires a party alleging fraud to "state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). To satisfy Rule 9(b), Plaintiffs must identify the ""who, what, when, where and how of the events at issue." *In re Rockefeller Ctr. Properties, Inc. Sec. Litig.*, 311 F.3d 198, 217 (3d Cir. 2002) (citations and quotations omitted). "In the FCA context, this requires a Plaintiff-Relator to allege 'particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted.'" *Druding v. Care Alternatives, Inc.*, 164 F. Supp. 3d 621, 626–27 (D.N.J. 2016) (quoting *Foglia*, 754 F.3d at 156).

      c. **Rule 15**

6

Federal Rule of Civil Procedure 15 provides that "a party may amend its pleading only with the opposing party's written consent or the court's leave," but instructs that "court[s] should freely give leave when justice so requires." Fed. R. Civ. P. 15(a)(2); *Haas v. Burlington Cty.*, 955 F. Supp. 2d 334, 337 (D.N.J. 2013) (citations omitted). In general, "motions to amend pleadings should be liberally granted." *Long v. Wilson*, 393 F.3d 390, 400 (3d Cir. 2004) (citations omitted). "Leave to amend may be denied, however, if amendment would be futile." *Alvin v. Suzuki*, 227 F.3d 107, 121 (3d Cir. 2000) (citation omitted). "An amendment is futile if the amended complaint would not survive a motion to dismiss for failure to state a claim upon which relief could be granted." *Id. See also In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1434 (3d Cir. 1997) (same).

### III.  Analysis

Before turning to the substance of the present motion, the Court first clarifies that it will review Relator's Amended Complaint to determine whether it is futile. The Amended Complaint supplements the Complaint with details concerning the allegedly fraudulent billing scheme and the individuals who participated in it. As discussed above, the standard for reviewing the Amended Complaint for futility under Rule 15 is the same standard that would apply if the Court reviewed Relator's Complaint under Rules 8 and 9(b). Thus, if the Amended Complaint is futile, the Complaint necessarily must be dismissed for failure to state a claim.

"A False Claims Act violation occurs when a person 'knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval.'" *United States ex rel. Petratos v. Genentech Inc.*, 855 F.3d 481, 486 (3d Cir. 2017) (quoting 31 U.S.C. § 3729(a)(1)(A)). To state an FCA claim, a relator must allege four elements: falsity, causation, knowledge, and materiality. *Id.* at 487 (citing *Universal Health Servs., Inc. v. United States*, 579 U.S. 176, 182 (2016)). The

FCA's "scienter requirement defines 'knowing' and 'knowingly' to mean that a person has 'actual knowledge of the information,' 'acts in deliberate ignorance of the truth or falsity of the information,' or 'acts in reckless disregard of the truth or falsity of the information.'" *Universal Health Servs.*, 579 U.S. at 182 (quoting 31 U.S.C. § 3729(b)(1)(A)).

Before considering L3's argument that Relator fails to adequately plead the scienter element, the Court must first explain the concept of IR&D costs introduced above and construe this concept in the context of an FCA claim.

### a. IR&D Costs

The crux of Relator's case is that L3 billed Project X for work completed to fulfill the RAN Contract, and that L3 charged the United States for the work billed to Project X as IR&D costs. A crude example helps to illustrate the concept of IR&D costs. Suppose a contractor developed a widget made of three components to meet the needs of three customers. One component ("Component 1") requires particularized development for each customer based on the customer's intended use of the widget. The other two components ("Components 2 and 3") are the same in all widgets and are essential to each widget's ability to function, but Components 2 and 3 cannot function without Component 1. The contractor charges each customer for custom developing Component 1. But who pays for the development of Components 2 and 3?

IR&D addressees this question. IR&D allows contractors to charge their clients for research and development "that is likely to benefit multiple contracts, both governmental and commercial" and to "spread[] … costs across multiple contracts." *ATK Thiokol, Inc. v. United States*, 598 F.3d 1329, 1335 (Fed. Cir. 2010). IR&D also prevents "the perverse effect of charging all of the research and development costs for a proposed product line against the first contract for the products in that line, whether the contract is governmental or commercial." *Id.*

In the context of government contracts specifically, several regulations determine "[w]hether particular research and development costs qualify as indirect IR&D." *Id.* at 1331.

> First, section 402 of the Cost Accounting Standards, 48 C.F.R. § 9904.402 ("CAS 402"), defines direct and indirect costs. A "direct cost" is "any cost which is identified specifically with a particular final cost objective"; an "indirect cost" is "any cost not directly identified with a single final cost objective, but identified with two or more final cost objectives, or at least one intermediate cost objective." CAS 402–30(a)(3),(4). CAS 402 gives the contractor considerable freedom in the classification of particular costs, so long as the contractor maintains consistency in making that determination. *See* CAS 402–20; *see also Boeing Co. v. United States*, 862 F.2d 290, 292–93 (Fed. Cir. 1988).
>
> Second, two parallel regulations determine whether certain costs qualify as IR & D. A provision of the Federal Acquisition Regulation, 48 C.F.R. § 31.205–18[4] ("FAR 31.205–18"), determines whether particular costs are allowable IR & D charges. A provision of the Cost Accounting Standards, 48 C.F.R. § 9904.420 ("CAS 420"), determines whether those costs are allocable to the particular contract in question. Both the FAR and the CAS define IR & D as excluding costs that are "required in the performance of a contract." FAR 31.205–18(a); CAS 420–30(a)(6).

*Id.* at 1332. While the Third Circuit has not interpreted these regulations, the Federal Circuit has held that costs "required in the performance of a contract" under FAR 31.205-18(a) means "costs that are specifically required by the contract." *Id.* at 1335.

### b. Construing the IR&D Regulations in an FCA Claim on a Motion to Dismiss

L3 argues that, under the Federal Circuit's interpretation of FAR 31.205-18(a), Relator must plausibly allege that L3 knew that the work billed to Project X—and charged to the United States government—was "specifically required by" the RAN Contract in order to plead the

---

[4] IR&D costs may fall in four categories: (1) basic research; (2) applied research; (3) development; and (4) systems and other concept formulation studies. FAR 31.205-18(a).

9

scienter element. [Dkt. 26 at 8–9]. The Court finds that L3 has properly recited the pleading standard for scienter given Relator's theory of FCA liability.

To understand why this is the proper pleading standard, it is necessary to understand that the scienter and falsity elements of an FCA claim are two sides of the same coin. Showing that a defendant "knew" that false claims were submitted to the Government requires a relator to establish that the defendant knew that claims submitted to the Government were "false."[5] Though a relator may establish FCA falsity in several ways,[6] claims for government payment are false or fraudulent if they misrepresent a true state of affairs by express misrepresentation or

---

[5] *United States ex rel. Purcell v. MWI Corp.*, 807 F.3d 281, 287 (D.C. Cir. 2015) (noting that an FCA plaintiff must show "that the defendant knew that the claim was false."); *United States ex rel. Oliver v. Parsons Co.*, 195 F.3d 457, 464 (9th Cir. 1999) ("The third element of a cause of action under the Act requires that the defendant knew the claim was false or fraudulent."); *United States v. DynCorp Int'l, LLC*, 253 F. Supp. 3d 89, 108 (D.D.C. 2017) ("Since [the FCA] imposes liability only on defendants who 'knowingly' present false claims, the defendant in a fraudulent inducement case must have known that the statements inducing the agreement were false."); *United States ex rel. Harris v. Bernad*, 275 F. Supp. 2d 1, 6 (D.D.C. 2003) (noting that the scienter element requires a showing that the "defendant knew the claim was false" (citations omitted)).

[6] Three theories of falsity exist for FCA claims:

> (1) a factually false theory, under which a claim for payment is made to the government seeking payment for services that were never actually provided or for which the description of the goods or services provided is incorrect; (2) an express false legal certification theory, where a claim for payment of federal funds falsely certifies compliance with a statute or regulation that must be complied with before payment can be made; and (3) an implied false legal certification theory, where, although the claim for payment does not certify compliance with a statute or regulation on its face, compliance is a prerequisite to payment under the express statutory or regulatory terms.

*United States v. N. Adult Daily Health Care Ctr.*, 205 F. Supp. 3d 276, 293 (E.D.N.Y. 2016).

omission. *United States ex rel. Zizic v. Q2Admins., LLC*, 728 F.3d 228, 236 (3d Cir. 2013) (citations omitted).

Here, Relator alleges that L3's claims for Government payment were "false" because L3 performed work for the RAN but charged the Government for the work. Relator alleges that L3 mischaracterized work chargeable to the RAN as IR&D work chargeable to the Government, which resulted in "false" claims to the Government. But the regulations defining IR&D—not Relator—distinguish true from "false" IR&D charges to the Government. As the Federal Circuit has emphasized when interpreting these regulations, L3's IR&D claims to the Government are not "false" simply because the RAN informally requested or benefitted from the work underlying the claims. *See* CAS 402 (defining "indirect cost" as "any cost not directly identified with a single final cost objective, but identified with two or more final cost objectives, or at least one intermediate cost objective"); *ATK Thiokol*, 598 F.3d at 1335 (noting that IR&D allows contractors charge their clients for research and development "that is likely to benefit multiple contracts, both governmental and commercial"). Instead, whether these claims were "true" or "false" depends on whether the work that generated the IR&D bills to the Government was "specifically required by" the RAN Contract. *ATK Thiokol*, 598 F.3d at 1335.

The Court derives the proper scienter pleading standard from this definition of falsity. Whether L3 "knew" that it submitted false claims therefore depends on whether L3 actually knew that the work underlying its IR&D claims to the Government was "specifically required by" the RAN Contract, or recklessly disregarded the fact that bills to the Government were generated by work "specifically required by" the RAN Contract. *See also United States v. Newport News Shipbuilding, Inc.*, 276 F. Supp. 2d 539, 551 (E.D. Va. 2003) ("[A]s an essential

11

element of its FCA claims, the government must show that [defendant] knew that the disputed IR & D charges were improper under [federal regulations] and therefore false.").

The Court will apply this standard strictly when reviewing Relator's Amended Complaint. Strict application is necessary to ensure that Relator alleges a plausible—rather than possible—claim for relief based on "false" claims to the Government as defined above. *Twombly*, 550 U.S. at 570. Strict application is necessary to ensure that Relator grounds his FCA claim in knowing and unlawful billing to the Government. *United States v. Comstor Corp.*, 308 F. Supp. 3d 56, 88 (D.D.C. 2018) ("[T]he scienter requirement under the FCA … is addressed through strict enforcement … in order to allay concerns about fair notice and open-ended liability." (citations and quotations omitted)). The line between plausible and possible here is thin, as the distinction between proper and improper IR&D billing hinges on technical application of IR&D regulations that also give L3 "considerable freedom in the classification of particular costs." *ATK Thiokol*, 598 F.3d at 1332. So while the Court must assume all facts alleged in the Amended Complaint to be true, *Iqbal*, 556 U.S. at 679, the Court will apply the law strictly to the facts to satisfy itself that Relator states a plausible claim for relief.

    c. **Application to Amended Complaint**

Having decided on the appropriate standard to apply to Relator's Amended Complaint, the next step is to determine whether Relator has adequately alleged the scienter element of his FCA claim.[7] Though this case presents a close call, the Court finds that Relator fails to do so.

---

[7] The Court notes that it is writing on a blank slate by applying this standard on a motion to dismiss, as the Court's research did not identify any cases applying FAR 31.205-18(a) in the context of a motion to dismiss in an FCA claim.

The Amended Complaint does not identify anyone at L3 who knew *both* that L3 was billing the Government for RAN work *and* that billing the Government for RAN work was improper. Relator points to three examples of L3's knowledge, all of which are deficient. The first example concerns Redmond, a Vice President of Engineering at L3. The Amended Complaint alleges that billing to Project X "could not have" occurred "without the specific approval" of Redmond and that, as a matter of corporate policy, Redmond must have consulted with L3's compliance department before approving this billing policy. [Am. Compl. ¶¶ 30, 36].

These allegations about Redmond and L3's compliance department fail to plead both the "knowledge" and "falsity" components of the FCA's scienter element. The Amended Complaint does not state that Redmond or L3's compliance department knew of or recklessly disregarded the billing practices, and insist that Redmond and L3's compliance department must have known of the improper billing to Project X based purely on L3's corporate policies and structure. But the Third Circuit has found that "[a] pleading of scienter sufficient to satisfy Rule 9(b) may not rest on a bare inference that a defendant must have had knowledge of the facts or must have known of the fraud given his or her position in the company." *In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 282 (3d Cir. 2006).[8] *See also GSC Partners CDO Fund v. Washington*, 368 F.3d 228, 239 (3d Cir. 2004) ("Of course, it is not enough for plaintiffs to

---

[8] *In re Suprema Specialties* concerns violations of federal securities laws which impose particularized and more exacting scienter pleading requirements not included in the FCA. *See In re Suprema Specialties*, 438 at 276 (noting that complaints in securities cases must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind" "with respect to each act or omission alleged" (quoting 15 U.S.C. § 78u–4(b)(2))). But the statement of law as quoted above concerns Rule 9(b), not the particularities of federal securities laws. *Id.* at 282. *See also In re Advanta Corp. Sec. Litig.*, 180 F.3d 525, 539 (3d Cir. 1999) (finding that scienter allegations based on an individual's corporate role fail separately under federal securities laws and Rule 9(b)). Thus, the Court finds that *In re Suprema Specialties* controls.

merely allege that defendants 'knew' their statements were fraudulent or that defendants 'must have known' their statements were false."). Even if the Redmond example showed knowledge of billing practices generally, it fails to show that Redmond or L3's compliance department knew that work billed to the Government via Project X was "required by" the RAN contract and, therefore, that the claims to the Government were false.

Second, the Amended Complaint's allegations concerning Cubby fall short. The Amended Complaint alleges that Cubby directed Plaintiff and others to bill work to Project X. [Am. Compl. ¶¶ 24–25, 28–29]. But the Amended Complaint does not allege, even generally, that Cubby knew that billing to Project X would result in false claims to the Government because the work billed to Project X was "specifically required by" the RAN Contract. *Purcell*, 807 F.3d at 287 (noting that an FCA plaintiff must show "that the defendant knew that the claim was false."). Nor does the Amended Complaint provide any circumstantial information about Cubby's role at L3 or interactions with others at L3 that would permits a plausible inference that he knew or recklessly disregarded the fraudulent consequences of billing work to Project X. Without more, the Amended Complaint merely suggests that it is possible that Cubby knew of the alleged fraud, which is inadequate to state a claim. *Twombly*, 550 U.S. at 570.

Third, the Amended Complaint discusses the Presentation, which refers to the RAN when describing Symphony modifications to be developed under Project X. But the Presentation does not support a finding of knowledge on its own or cure the deficiencies in the Redmond or Cubby allegations. As L3 argues, "the pleadings say nothing of who, if anyone other than Relator, drafted, approved, or even saw" the presentation. [Dkt. 26 at 18]. It is possible that the CEO of L3 made the Presentation and disseminated it to the entire company. It is equally possible that an intern made the Presentation and only showed it to Relator. The Amended Complaint simply

does not say. Without any circumstantial information about the Presentation's creation or distribution, the Court cannot impute knowledge of the work to be performed under Project X to L3 based on the Presentation.

At bottom, the Court finds that the Amended Complaint fails to adequately plead the scienter element of Relator's FCA claim. Court therefore rejects Relator's request for leave to file the Amended Complaint because the proposed Amended Complaint is futile. The Amended Complaint contains more detail and factual information than the original Complaint, so the Court also finds that the Complaint is deficient, and will grant L3's motion to dismiss. The Court will, however, grant Relator leave to file an amended complaint.

### IV.  Conclusion

For the reasons set forth above, the Court will grant L3's motion to dismiss and deny Relator's motion for leave to leave to file an amended complaint. The Court will grant Relator leave to further amend. An appropriate order will follow.


March 30, 2022                                                            s/ Joseph H. Rodriguez
                                                                          Hon. Joseph H. Rodriguez, USDJ